Jill Gilbert WELYTOK,
Petitioner-Respondent,

v.

Timothy J. ZIOLKOWSKI,
Respondent-Appellant.†

Court of Appeals

*No. 2007AP347. Submitted on briefs November 29, 2007.
—Decided April 30, 2008.*

2008 WI App 67

(Also reported in 752 N.W.2d 359.)

† Petition to review denied 7/28/08.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Joseph R. Cincotta* of *Law Offices of Joseph R. Cincotta*, Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Rex R. Anderegg* of *Anderegg & Mutschler, LLP*, Milwaukee.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J. Timothy J. Ziolkowski appeals from an order of injunction. Jill Gilbert Welytok filed for a harassment injunction against Ziolkowski and, after a hearing, the circuit court ordered the injunction. Ziolkowski's tactics were disappointing to say the least. The fact that he is an attorney only heightens our aversion for his behavior. That said, our decision rests not on our distaste for Ziolkowski's behavior, but on our deferential standard of review and the facts of record. We affirm the circuit court.

¶ 2. The injunction hearing revealed the following. Jill Gilbert Welytok and Daniel Welytok, Timothy Ziolkowski and Steve Berman are all attorneys. Jill and Ziolkowski are both patent attorneys. In 2004, the Welytoks became involved in a bidding war for a piece of property with Ziolkowski. Ziolkowski did not realize at the time that he was bidding against the Welytoks. The Welytoks' bid was ultimately accepted by the seller and they closed on the property in July 2004. Thereafter, in August 2004, Ziolkowski learned over the phone from Daniel that it was the Welytoks[1] that had outbid him for the property. Daniel testified that upon learning this, Ziolkowski blurted out, "[Y]ou're not going to profit from this," and then promptly hung up the phone.

[1] Ziolkowski testified that Daniel told him that Jill was the sole purchaser of the disputed property. Daniel testified that he told Ziolkowski that he and his wife had purchased the land. The circuit court, as we will later discuss, found the testimony of the Welytoks more credible.

Daniel stated that he was uncomfortable about this and did not want to sever his friendship with Ziolkowski.

¶ 3. After learning the Welytoks had outbid him for the land, Ziolkowski met with Berman while he was on business in Washington D.C. Berman testified that at the meeting in D.C., Ziolkowski was "clearly quite upset" and expressed to Berman that he believed he "had been wronged." Berman testified that Ziolkowski said he was not going to just let it be. Berman confirmed that Ziolkowski "stated repeatedly his intention to seek revenge," and that Ziolkowski "specifically threatened to 'go after' the law licenses" of the Welytoks. Berman testified that he considered Ziolkowski "a very good friend at the time, whose company I enjoyed. I'm not trying to pick sides here." He said he suggested to Ziolkowski to "let sleeping dogs lie," but he also suggested that he meet with Daniel to resolve the dispute. Thereafter, Berman informed Daniel of the conversation he had with Ziolkowski.

¶ 4. In order to reconcile the dispute over the property, Daniel arranged to meet Ziolkowski at the Speakeasy, a restaurant/bar near the Welytoks' home. Jill testified that she came to the Speakeasy during this meeting in order to drop off a house key for Daniel because she had locked the house and the couple only had one key, having lost two other sets. She then testified to what happened after she arrived at the Speakeasy:

> Q So you went into the Speakeasy to drop off a key with your husband, correct?
>
> A Yes.
>
> Q What happened at the table?
>
> A I said hello to Tim [Ziolkowski]. I realized that they were in—meeting intently, and I didn't sit down. I

didn't want to disrupt their meeting, plus I was running an errand; so I greeted them both and then I left.

Q Were you aware of bad blood between Mr. Ziolkowski and your husband?

A Yes. And I hoped that the meeting would resolve it.

Q What happened when you were leaving?

A I left, and I heard Tim's voice. I turned around, and there was a crosswalk that you had to walk to, to the car. And he stepped in front of me and blocked it and started yelling at me, saying other words, but the words I remember that were most shocking to me were "Say good-bye to your law license."

Q Did you try to get past Mr. Ziolkowski?

A Yes. I was so shocked, I just wanted to get out of there, but he was standing in front of me. And luckily my husband came out.

Q What happened then?

A I heard my husband yell hey, or leave her alone, or something like that. And then he got Tim's attention, and I just took off.

¶ 5. Ziolkowski's version of this Speakeasy meeting differs. He testified that Daniel told him that he was "sorry" and that "Jill just went off and . . . she got the land independently." Ziolkowski testified that after Daniel told him this, Jill came in to the Speakeasy and that "it was actually kind of cold" between himself and Jill. He said he "got kind of a cold stare from Jill . . . and I certainly got the impression that she came there for a confrontation." He said she stood, but he thinks she stayed for one drink. He said when Jill got up to leave, he got up and followed her to the door. He said he "just

said to her . . . you bought the land?" He said she said, "[Y]es, I did." He said he told her, "I'm shocked. I mean how did you—You really think that the land is worth all—is worth it for this?" He then testified that this was the end of their conversation. He said Jill walked one way and he walked back in where Daniel was still sitting. He testified that Jill then came back in and said, "Dan, a word please?" He said that the Welytoks then left the Speakeasy.

¶ 6. Daniel's version of the meeting at the Speakeasy corroborates Jill's. Daniel said that during the meeting, "it became apparent that [Ziolkowski] was not very happy about the whole situation and was not willing to reconcile." He stated that Jill came to the Speakeasy in order to drop off a house key because they only had one key at that time. He said that after his wife dropped off the key, she left and went upstairs (they were meeting in the basement of the Speakeasy). He said that as she was going upstairs, Ziolkowski told him, "I'm going to the men's room." He said that instead, he saw Ziolkowski run up the stairs behind Jill. He said he then followed Ziolkowski because he "knew that something was going on." Daniel further testified that he ran out to the parking lot and saw Ziolkowski "towering over my wife, screaming at her, not letting her pass and saying, 'Your law license is gone.' " Daniel said he told Ziolkowski to stop it and get away from his wife. He said at this point Jill ran and got into her car and drove off.

¶ 7. Various other exchanges took place between Daniel and Ziolkowski, one of which involved an e-mail from Ziolkowski that referenced the fact that Jill had registered for a name change from Jill Gilbert to Jill Gilbert-Welytok. Ziolkowski titled this e-mail "Pretty slick" and wrote within it: "This should give a boost to your career." Daniel forwarded this e-mail to Jill. Within

a day of this e-mail, Jill received a surprise visit at her office from the investigative reporting team of Cary Spivak and Dan Bice,[2] who she said "stormed in the office in these leather bombadiers and asked me if I'm changing my name to hide from my past." She said she talked to them and, in the end, they apologized to her and explained that they had to follow up on anonymous tips. Ziolkowski testified that he had nothing to do with the tip that led to the reporters' visit; however, he also admitted that one year after this incident, he in fact did contact the same reporters and reported the same information. The trial court found this incredible and thus did not believe Ziolkowski was not involved in the earlier tip.

¶ 8. In March 2005, Daniel received a certified letter from Ziolkowski's law firm. The letter was from Ziolkowski and contained an unsolicited offer to purchase the disputed property. The offer was approximately $32,000 less than the Welytoks had paid for the property. Daniel ignored the offer and then in June 2005, he received another communication from Ziolkowski via an e-mail which stated, "It would probably be a good idea to talk." Daniel eventually e-mailed back explaining the property was not for sale.

¶ 9. Jill testified that in the early part of 2006, her new boss was contacted by someone who she believes was Ziolkowski, who identified himself as an attorney and who, according to her boss, made efforts to get her fired from her job.

¶ 10. Jill testified that in 2006, she was involved in organizing and participating in a meeting that was to be held by the Northshore Inventors and Entrepre-

---

[2] Cary Spivak and Dan Bice wrote the "Spivak & Bice" column for the Milwaukee Journal-Sentinel.

neurs Forum (the Forum). The meeting was scheduled to take place at the Grafton Library on December 5, 2006. Jill had taken a lead role publicizing the Forum meeting and promoted it on her firm's website.

¶ 11. One week before the Forum meeting, on November 30, 2006, Ziolkowski sent e-mails to people Jill would be working with at the meeting. These e-mails contained the web link to a 1999 disciplinary decision against Jill, which resulted in the loss of her law license from 1999 until its 2002 reinstatement. One e-mail was directed to Paul Roback, the Director of Community Development for Ozaukee County and the Eastern Shores Library System, who also had an organizational role in the Forum meeting. Ziolkowski testified that he contacted Roback by phone and eventually e-mail prior to the Forum meeting and told him he was an attorney acting on behalf of Consumer Help, LLC, who wanted to share some information with him. Another e-mail with the link to Jill's disciplinary decision was forwarded to John Suckow, a featured speaker at the Forum meeting. After receiving this e-mail, Suckow called Jill and questioned why a nonprofit organization would be disseminating unflattering e-mails about her. Suckow forwarded the e-mail and Jill was able to confirm that it had come from Ziolkowski. After explaining to Suckow what she believed were Ziolkowski's motives, Jill called Roback to explain. She testified that in her conversation with Roback, she learned Ziolkowski had attempted to persuade Roback to cancel the Forum meeting.

¶ 12. Jill testified that the e-mails to Roback and Suckow and the "Pretty Slick" e-mail to her husband all left her feeling very upset, worried and anxious; in addition, she began having trouble sleeping. Daniel testified that he began to worry Ziolkowski might be

446

dangerous and he searched for any history on Ziolkowski. He found Ziolkowski had been criminally charged in 1999 for disorderly conduct. He then followed up and obtained police reports, learning the charge had been issued criminally because the police had recognized Ziolkowski from prior incidents. Daniel testified that he learned that because the 911 tape of the 1999 incident had been destroyed, the charge had ultimately been dismissed.

¶ 13. As the date of the Forum meeting, December 5, 2006, approached, Jill contacted the Grafton Library to inquire about its policy on excluding potentially disruptive individuals from meetings. The Library informed her it had always reserved that right. Jill testified that she contacted the Grafton Police Department and let it know that she was going to send a letter to Ziolkowski "asking that he not attend this meeting; that if the issues were resolved he could attend future meetings, but that he not attend this meeting because of a situation with e-mails and my feeling that he might disrupt the event." She stated that she sent a copy of the letter to Ziolkowski and Officer Goodearle at the police department. She also sent an e-mail to Ziolkowski that implied that she had information about him that was embarrassing but that she "certainly [did] not plan on raising it in an unfair way, ever."

¶ 14. Ziolkowski testified: "[T]hat afternoon . . . after Jill Welytok had sent me the letter telling me I couldn't go [to the Forum meeting] was really when I decided to go. And I put together the [flyer] kind of quickly and went to the meeting." Ziolkowski admitted that he contacted investigative reporters Spivak and Bice, spoke to Mike Nichols from the Milwaukee Journal-Sentinel and contacted radio personality Mark

Belling regarding Jill. (Though, as noted earlier, Ziolkowski denied calling in the anonymous tip regarding the same information about Jill the year before to Spivak and Bice.) Jill testified that she received a phone call from Belling, who she said screamed at her about changing her name to hide her past after which he mentioned the content of her disciplinary action and asked her if she was "trying to bilk the state of funds." She said it sounded as if Belling was reading from something he had received. She testified that the experience left her "feeling terrible." She stated that she "could not eat or sleep for a day or so. It took a while to calm down and deal with [her] kids and get on with [her] work." Ziolkowski testified that his reason for contacting the press was "public interest" and "concern":

> [T]o say that this looks somewhat suspicious; but, you know, I just said that Jill Welytok is—or Jill Gilbert is now going by Jill Welytok, using a different name. And I just thought it might be a public interest story that they might want to follow up on. And I was concerned about it, the State sponsorship, the clear indication on the advertisements that this [Forum meeting] is being sponsored by the State.

¶ 15. The day of the Forum meeting, Jill was accompanied by an acquaintance. She testified that she told the acquaintance that she was concerned that someone may come and try to disrupt the meeting and asked if he would accompany her so that she did not have to arrive alone. Jill first became aware that Ziolkowski was outside the library when people started coming in with flyers and her partner rushed upstairs to see where they were coming from. She said she "sort of knew." She said she was "shocked and frightened" and thought it was best if she stayed downstairs in the meeting room.

¶ 16. Daniel testified that he came to the library that day and, while inside speaking to an acquaintance, he could see Ziolkowski and his young daughter standing in the parking lot, each holding a stack of papers in their arms and handing them out to everyone who approached the library. The flyer was titled "Background Information on Attorney Jill Welytok" and it was a copy of the disciplinary proceeding against her— the same document Ziolkowski had e-mailed to Roback and Suckow. At the bottom of the flyer was printed: "Paid for and distributed by Tim Ziolkowski, Consumer Help, LLC. This information is provided to assist consumers with making an informed decision." Upon seeing the flyer, Attorney Michael Baffa, who was at the library to attend the Forum meeting, called the police, who arrived and asked Ziolkowski to leave.

¶ 17. Ziolkowski testified that he was "displeased with the way [the property] transaction had occurred." However, he stated that his motivation for the e-mails to the co-organizers of the Forum meeting and creating and distributing the flyers were "strictly to provide information . . . . I wasn't being vindictive."

¶ 18. The circuit court was not persuaded by Ziolkowski's explanation:

> I'm certainly sure that Mr. Ziolkowski intended everything that he did and was practically certain that his conduct was going to cause that result.
>
> He has to engage in a course of conduct or repeatedly commit acts which harass and intimidate a person and which serve no legitimate purpose. A course of conduct is . . . a series of acts over a period of time, however short, evidencing a continuity of purpose. There's clearly a series of acts over a period of time that evidence a continuity of purpose.

> This is all related to one issue, and it relates to this land deal . . . .

> "[H]arass" means to worry, to impede by repeated attacks, to vex, to trouble, annoy, continually or chronically plague, bedevil or badger. "Intimidate" means to make timid or fearful. Mrs. Welytok has certainly discussed her fear of Mr. Ziolkowski's repeated pattern directed at her.

¶ 19. The circuit court, in noting that the statute requires that there be no legitimate purpose for Ziolkowski's behavior, acknowledged that the no legitimate purpose element was "clearly the most difficult issue in this case." It then determined there to be no legitimate purpose for Ziolkowski's actions because he "[did not] do this with other people [who] have disciplinary proceedings" against them. It further based its no legitimate purpose determination on its finding that Ziolkowski was "motivated by one thing and one thing only and that was to harass Mrs. Welytok." It concluded that Ziolkowski's course of conduct was aimed at "destroying Jill Gilbert Welytok's [law] license."

¶ 20. The circuit court discussed its credibility assessment of Ziolkowski's version of events at the Speakeasy:

> [F]rankly, I think there are some credibility issues here, Mr. Ziolkowski, as opposed to what I saw with Mr. Welytok and Mrs. Welytok's testimony as to what happened. And I choose to believe theirs. It appeared to be a more credible and more logical understanding as to what had taken place.

¶ 21. Because the circuit court found Ziolkowski incredible and the Welytoks credible, it found that there was an altercation in the parking lot at the Speakeasy,

that Ziolkowski instigated it and that Ziolkowski did say that he was going to get Jill's law license.

¶ 22. The circuit court also found Berman's testimony "extremely convincing." The court noted that Berman talked highly of Ziolkowski and considered him a good friend. The court believed Berman when he stated that Ziolkowski told him he was going after the Welytoks' law licenses and going to ruin them. The court referenced the "Pretty Slick" e-mail. It also stated that it did not believe Ziolkowski when he said he did not contact Spivak and Bice about Jill the year before the Forum meeting and had only first contacted them shortly before the Forum meeting. The court believed that Ziolkowski hid behind his self-created Consumer Help, LLC, in order to not get sued for defamation or slander. The court granted the harassment injunction holding that Ziolkowski intended to harass Jill by his pattern of conduct which served no legitimate purpose and that his conduct did harass Jill. *See* WIS. STAT. § 947.013(1m)(b) (2005–06).[3] Ziolkowski appeals.

### Standard of Review

¶ 23. To grant an injunction under WIS. STAT. § 813.125, the circuit court must find "reasonable grounds to believe that the respondent has [violated WIS. STAT. §] 947.013." Sec. 813.125(4)(a)3. This presents a mixed question of fact and law. *M.Q. v. Z.Q.*, 152 Wis. 2d 701, 708, 449 N.W.2d 75 (Ct. App. 1989). We will not set aside the circuit court's factual findings unless they are clearly erroneous. WIS. STAT. § 805.17(2). We independently review the circuit court's conclusion,

---

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

based on the established facts, whether such reasonable grounds exist. *M.Q.*, 152 Wis. 2d at 708. Whether Jill has met her burden of proof also is a question of law, *see Brandt v. Brandt*, 145 Wis. 2d 394, 409, 427 N.W.2d 126 (Ct. App. 1988), as is applying a statute to those facts which are undisputed. *See Garcia v. Mazda Motor of Am., Inc.*, 2004 WI 93, ¶ 7, 273 Wis. 2d 612, 682 N.W.2d 365. Our review entails yet one more step. Section 813.125(4)(a) provides that a judge may grant an injunction if certain conditions are satisfied, implying the exercise of discretion. *See Kotecki & Radtke, S.C. v. Johnson*, 192 Wis. 2d 429, 447–48, 531 N.W.2d 606 (Ct. App. 1995). Therefore, whether or not to finally grant an injunction is within the sound discretion of the circuit court, and our review ultimately is limited to whether that discretion was properly exercised. *Pure Milk Prods. Coop. v. National Farmers Org.*, 64 Wis. 2d 241, 251, 219 N.W.2d 564 (1974).

¶ 24. The scope of an injunction is within the sound discretion of the trial court, *State v. Seigel*, 163 Wis. 2d 871, 889–90, 472 N.W.2d 584 (Ct. App. 1991), and the limited scope of our review of discretionary rulings is well settled. We may not overturn a discretionary determination that is demonstrably made and based upon the facts of record and the appropriate and applicable law. *Id.* at 889. Also, because the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary rulings. *Steinbach v. Gustafson*, 177 Wis. 2d 178, 185, 502 N.W.2d 156 (Ct. App. 1993). Injunctions, of course, must be specific as to the prohibited acts and conduct in order for the person being enjoined to know what conduct must be avoided. *See Bachowski v. Salamone*, 139 Wis. 2d 397, 414, 407 N.W.2d 533 (1987).

## Analysis

¶ 25. As we have stated, to grant a harrassment injunction under Wis. Stat. § 813.125, the circuit court must find reasonable grounds to believe that the respondent has violated Wis. Stat. § 947.013. A violation of § 947.013 occurs, inter alia, when the actor, "with intent to harass or intimidate another person . . . [e]ngages in a course of conduct or repeatedly commits acts which harass or intimidate the person and which serve no legitimate purpose." Sec. 947.013(1m)(b). A "course of conduct" is a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." Sec. 947.013(1)(a). Wisconsin Stat. § 939.23(4) defines "with intent to" as meaning "that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result."

¶ 26. Intent is a fact: "The state of a [person's] mind is as much of a fact as the state of his [or her] digestion." *State v. Lossman*, 118 Wis. 2d 526, 543, 348 N.W.2d 159 (1984) (quoting William L. Prosser, The Law of Torts § 104, at 745 (3d ed. 1964)). Intent is a fact that "must be inferred from the acts and statements of the person, in view of the surrounding circumstances." *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 569, 360 N.W.2d 65 (Ct. App. 1984). In situations where only one reasonable inference may be drawn from the evidence, the drawing of that inference is a question of law, which we review independently. *Vocational, Technical & Adult Educ., Dist. 13 v. DILHR*, 76 Wis. 2d 230, 240, 251 N.W.2d 41 (1977).

¶ 27. Where, however, more than one reasonable inference can be drawn from the credible evidence, we accept the reasonable inference drawn by the circuit court sitting as fact finder. *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979). It is not within the province of any appellate court to choose not to accept an inference drawn by a fact finder when the inference drawn is a reasonable one. *W.W.W. v. M.C.S.*, 185 Wis. 2d 468, 489, 518 N.W.2d 285 (Ct. App. 1994); *see also State v. Friday*, 147 Wis. 2d 359, 370–71, 434 N.W.2d 85 (1989).

[11]

¶ 28. When there is conflicting testimony, the circuit court is the ultimate arbiter of the witnesses' credibility. *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 676, 273 N.W.2d 279 (1979). Such deference is appropriate because the court has the opportunity to observe firsthand the demeanor of the witnesses and gauge the persuasiveness of their testimony. *State v. McCallum*, 208 Wis. 2d 463, 488, 561 N.W.2d 707 (1997) (Abrahamson, CJ., concurring) ("[T]he circuit court is in a much better position than an appellate court to resolve whether the witness is inherently incredible."). In short, we defer to the circuit court's credibility determinations and we affirm a circuit court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2).

¶ 29. Ziolkowski makes four arguments on appeal. First, he argues that the circuit court did not consider the "no legitimate purpose" element of WIS. STAT. § 813.125. Second, he argues his constitutional rights were violated because Jill's corroborating witness was allowed to testify telephonically and should have been required to testify in person. Third, he argues that

the circuit court's factual findings are not supported by a reasonable view of the evidence. Finally, he argues that the circuit court's order is overly broad.

¶ 30. *No Legitimate Purpose:* We agree with Ziolkowski that a violation of Wis. Stat. § 813.125 may not rest on conduct that serves a legitimate purpose. However, whether conduct serves a legitimate purpose "is a determination that must of necessity be left to the fact finder, taking into account all the facts and circumstances." *Bachowski*, 139 Wis. 2d at 408. We do not agree with Ziolkowski's argument that the circuit court "simply did not consider" the no legitimate purpose element. The circuit court specifically considered this element and, after taking into account all the facts and circumstances, determined that Ziolkowski's conduct was not done for any legitimate purpose. *See id.* Ziolkowski's attempt to manufacture a legitimate purpose falls short. The legitimate purpose determination is such that the fact finder must determine if any legitimate purpose was *intended at the time* of the conduct. *See id.*

¶ 31. The circuit court found that there was no legitimate purpose intended and we will not upset that finding. The circuit court specifically recognized that the statute requires that there be no legitimate purpose for Ziolkowski's behavior. It even acknowledged that the no legitimate purpose element was "clearly the most difficult issue in this case." It then discussed Ziolkowski's conduct and determined that he was "motivated by one thing and one thing only and that was to harass Mrs. Welytok." The court did not believe that consumer advocacy or any legitimate purpose was intended to be served by the actions of Ziolkowski related

455

to Jill. This determination is not clearly erroneous and we therefore uphold it. We note that Ziolkowski's own testimony supports the circuit court's finding of no legitimate purpose. Ziolkowski testified that when he learned about the Forum meeting, he called to inform Jill's co-organizers about her past. However, he also testified that it was only after Jill asked him not to attend the Forum meeting that he decided to "quickly put together" the flyers that flagged Jill's disciplinary action. His conduct reveals a retaliatory, harassing intent and not actions done for the legitimate purpose of informing consumers. The circuit court saw through Ziolkowski's attempts to manufacture a legitimate purpose and we accept its insight.

¶ 32. *Constitutional rights:* Ziolkowski argues that his constitutional rights were violated because Jill's corroborating witness, Berman, was allowed to testify telephonically and should have been required to testify in person. The decision whether to allow telephonic testimony lies within the sound discretion of the circuit court, *see Town of Geneva v. Tills*, 129 Wis. 2d 167, 176, 384 N.W.2d 701 (1986), using the considerations found in WIS. STAT. § 807.13(2)(c). In deciding to allow the telephonic testimony, the circuit court stated, "If you had a longer time to prepare, I would be less willing to take telephone testimony in a case like this. But you have a very short time span [and y]ou have the holidays." The circuit court was correct in noting the "very short time span" allowed: WISCONSIN STAT. § 813.125(3)(c) requires that a hearing be held within fourteen days after the temporary restraining order is issued.[4] Added to the short time span are other facts of

---

[4] WISCONSIN STAT. § 813.125(3)(c) states:

record which support the circuit court's decision to allow telephonic testimony: Ziolkowski knew about the intended telephonic testimony prior to the hearing (he filed a motion to preclude it) and he therefore was not unduly surprised or prejudiced; he was allowed to cross-examine and take as much time with the witness as he wanted; the witness, Berman, lived out of state; Berman was a friend of both parties; Berman is an attorney and, thus, an officer of the court who has a special obligation to be candid and honest with the tribunal. *See* SCR 20:3.3 (2007). We cannot say the circuit court's decision to allow telephonic testimony was error.

■■

¶ 33. *Sufficiency of the evidence:* Ziolkowski argues that the circuit court's factual findings are not supported by a reasonable view of the evidence. Ziolkowski relies on *Bachowski,* 139 Wis. 2d at 407–08, for the proposition that "single isolated acts do not constitute 'harassment' " under WIS. STAT. § 813.125(1)(b), and that an "immature, immoderate, rude or patronizing manner which annoys another is not enough." *See Bachowski,* 139 Wis. 2d at 407 (citation omitted).

■■

¶ 34. We do not quibble with those statements. Nonetheless, we are not persuaded by Ziolkowski's rendering of the evidence as isolated incidents of mere bothersome or annoying behavior. "Whether acts or

---

The temporary restraining order is in effect until a hearing is held on issuance of an injunction under sub. (4). A judge or circuit court commissioner shall hold a hearing on issuance of an injunction within 14 days after the temporary restraining order is issued, unless the time is extended upon the written consent of the parties or extended once for 14 days upon a finding that the respondent has not been served with a copy of the temporary restraining order although the petitioner has exercised due diligence.

conduct are done for the purpose of harassing or intimidating . . . is a determination that must of necessity be left to the fact finder, taking into account all the facts and circumstances." *Id.* at 408.

¶ 35. The supreme court in *Bachowski* observed that "harass" means "to worry and impede by repeated attacks, to vex, trouble or annoy continually or chronically, to plague, bedevil or badger," and "intimidate" means "to make timid or fearful." *Id.* at 407 (citations omitted).

¶ 36. We have taken into account all the facts and circumstances and hold that this case does satisfy the statutory definitions of "harassment" and "course of conduct." First, in light of the extreme deference we accord the circuit court's credibility determinations, *see Opstein*, 86 Wis. 2d at 676, we accept the court's findings because they are not clearly erroneous. The event at the Speakeasy was an intimidating and threatening scenario for Jill in which Ziolkowski blocked Jill's path, towered over her, threatened to go after her law license and only stopped his intimidation when Daniel came out and yelled at him to leave Jill alone. Ziolkowski made phone calls and sent e-mails to Jill's Forum meeting colleagues, Roback and Suckow. Ziolkowski made phone calls to investigative reporters which prompted them to call and/or barge in with accusations toward Jill. Ziolkowski called Jill's new employer in order to get her fired. Ziolkowski's conduct frightened Jill, caused her to have trouble sleeping and made her very upset, worried and anxious. Ziolkowski sent e-mails to Daniel, one of which was the "Pretty slick" e-mail referencing Jill's name change and making a sarcastic quip. Ziolkowski's conduct even caused Daniel to worry for his wife's safety and wonder if Ziolkowski might be dangerous.

¶ 37. The circuit court further found that all of Ziolkowski's actions stemmed from having lost out on a piece of property to the Welytoks. Ziolkowski told the court he believed Jill acted alone in buying the property. Ziolkowski's belief that Jill was to blame for him losing the property supports the court's finding that Ziolkowski's actions had one purpose: to harass and intimidate Jill. Ziolkowski testified to his motives and his version of the events which differed in significant parts from Jill's version. The circuit court was not persuaded by Ziolkowski. It listened to the testimony of a friend to both parties, Berman, which supported the version of events testified to by both Daniel and Jill. The court was in the best position to judge the credibility of the witnesses and determined Berman and the Welytoks to be more believable. It, therefore, drew its factual determinations in part from their testimony and it was perfectly within its discretion to do so.

¶ 38. Based on its findings of fact, the court found that Ziolkowski engaged in a series of acts over a period of time that evidence a continuity of purpose to harass Jill, that his actions did in fact harass her and that his actions served no legitimate purpose. The circuit court's factual findings are supported by a reasonable view of the evidence and it properly exercised its discretion in granting the injunction after, based on its factual findings, it determined there were reasonable grounds to believe that Ziolkowski had violated WIS. STAT. § 947.013. *See* WIS. STAT. § 813.125(4)(a)3.

¶ 39. *Overbreadth:* Finally, Ziolkowski argues that the circuit court's injunction order is overly broad and, thus, impermissibly infringes on and chills his free expression and liberty. Again, we disagree. The circuit court adequately explained the need for the parameters

of the injunction: in order to finally put a stop to Ziolkowski's harassment of Jill. The record bears out that need and, under all the circumstances of the case, we cannot say the result reached by the circuit court is unreasonable. It was a sustainable exercise of discretion under WIS. STAT. § 813.125. Ziolkowski's harassing actions at the Speakeasy and again at the Grafton Library, along with his repeated e-mails and phone calls to third parties, all with the intent to harass, discredit and even disbar Jill, support the breadth of the circuit court's injunction order which lists the specific prohibited conduct to be:

> Cease harassment of the petitioner[, Jill Gilbert Welytok,] and to avoid involving 3rd parties in the harassment; Avoid any contact with the petitioner or members of her household; Avoid the petitioner's residence; Stay at least 250 feet away from any premises temporarily occupied by the petitioner or a member of her household. Obey all legal requirements to obtain permits in connection with any distribution of materials or other communications, taking place on public property, concerning the petitioner or any member of her household; Disclose a copy of this court's order with any such permit application and disclose that he[, Ziolkowski, is] an attorney at the time he disseminates said materials.

¶ 40. We cannot say the circuit court erred in tailoring the parameters of the injunction based on "the lengths" that Ziolkowski showed he would go to harass Jill, *see Seigel*, 163 Wis. 2d at 890 ("Injunctive relief must be tailored to the necessities of the particular case"):

> This is a pattern of conduct, and you don't show any inkling of one iota of professional responsibility here.

460

You know what the right things are to do. But what you do, is you do a gutless thing where you run around and you call Spivak and Bice, and you call Belling, and you then show up there. You don't tell them you are a competing lawyer . . . .

. . . .

*This [behavior] is probably the most flagrant thing I've seen.* And I've seen a lot of them. You know, it's behavior like this, Mr. Ziolkowski, that results in lawyers being held in such low regard by the public. *And you don't even have an inkling as you sit there that you did anything wrong, and that's my biggest problem. I've listened to this, and I'm just stunned at the lengths that you've gone to harass* . . . . (Emphasis added.)

We trust the court's discretionary decision; it was in the best position to determine what restrictions were needed and we do not take lightly the court's comments as it crafted its order. On this record, we cannot conclude that the court's order was overbroad.

¶ 41. As we stated earlier, under WIS. STAT. § 813.125(4)(a), which provides that a judge may grant an injunction if certain conditions are satisfied, the decision whether or not to finally grant an injunction is a discretionary one and our review ultimately is limited to whether that discretion was properly exercised. *See Kotecki*, 192 Wis. 2d at 447–48. Our review of discretionary determinations of the circuit courts is quite limited. Where the record reveals an appropriate exercise of discretion on the court's part, as this record does, we will affirm the decision even if it is one we ourselves might not have made were we ruling on the

matter in the first instance. *See Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991).[5]

*By the Court.*—Order affirmed.

[5] We will forward a copy of this opinion to the Office of Lawyer Regulation pursuant to the requirement of SCR 60.04(3)(b) (2002).

> A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the rules of professional conduct for attorneys should take appropriate action. A judge having personal knowledge that a lawyer has committed a violation of the rules of professional conduct for attorneys that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority.