**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 20, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2021AP511**

**STATE OF WISCONSIN**

Cir. Ct. No. 2017ME34

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF D. D. G.:

OUTAGAMIE COUNTY,

    PETITIONER-RESPONDENT,

  V.

D. D. G.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Outagamie County: MITCHELL J. METROPULOS, Judge. *Affirmed.*

¶1 HRUZ, J.[1] Dana[2] appeals from an order extending her involuntary commitment and an order for involuntary medication and treatment, both entered

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

pursuant to WIS. STAT. ch. 51. Dana argues that Outagamie County ("the County") failed to establish that she was dangerous under the standards set forth in WIS. STAT. § 51.20(1)(a)2. She also challenges the circuit court's determination that she was not competent to refuse medication or treatment.

¶2    We conclude that the County met its burden in establishing that Dana was dangerous under both WIS. STAT. § 51.20(1)(a)2.c. and d. It also met its burden of proving that Dana was not competent to refuse medication or treatment based on one or both of the standards in WIS. STAT. § 51.61(1)(g)4. Accordingly, we affirm both orders.

## BACKGROUND

¶3    Dana was involuntarily committed pursuant to WIS. STAT. ch. 51 in March 2017 for a period of six months. Dana's commitment has been extended several times since then. The most recent order extending her commitment was entered on October 27, 2020. This 2020 recommitment order and the accompanying order for involuntary medication and treatment are the subjects of this appeal.

¶4    In September 2020, the County filed a petition to extend Dana's commitment for twelve months, and the circuit court held a recommitment hearing on October 26, 2020. Dana and three other witnesses testified at the recommitment hearing.

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than her initials.

¶5 First, psychiatrist Marshall Bales testified regarding his year working as Dana's treating physician, in addition to his review of her records. Bales confirmed that Dana suffered from schizophrenia, and that she did not currently present any symptoms because she was taking her medicine. However, Bales testified that prior to Dana's commitment—and before Bales had worked with her—she was "very psychotic, she was not thinking clearly, she neglected herself, she was disheveled, unkempt, and distinctively, you know, having problems, and this went on for a long time." In particular, in the encounter leading up to her initial commitment, Dana had placed paper in her electrical outlets, had limited amounts of food in her apartment, had "deteriorated," and was delusional. In addition, prior to her initial commitment, Dana had not been bathing, and she was not seeking voluntary treatment for her mental illness. Bales testified that he believed this behavior would reoccur if Dana's commitment were not extended.

¶6 Doctor Bales further testified that Dana was currently on a "very gentle dose" of her medication, which was administered in the form of an injection every six weeks. Dana had also been prescribed an oral medication to be taken "as needed" for any tremors that resulted from her antipsychotic injection. Bales testified that although Dana responded well to her medication, she "tends to minimize" her illness and does not "fully accept that she has a very severe mental illness." In addition, Bales opined that Dana was unable to apply an understanding of the advantages, disadvantages, and alternatives to medication in order to make informed decisions about her healthcare. Bales noted that he had frequent discussions with Dana about her medications, and that she minimized her need to take medication and embellished the side effects of her medication regimen at "every single appointment."

¶7 In response to being asked what he would need to see from Dana in order to be convinced that she would be "okay not under a commitment," Dr. Bales responded:

> just over time for her to just begin to show more insight, less arguing, about the details and the ins and outs of the medication, but just for her to demonstrate more insight and that she would take her medications on a voluntary basis; and she, in my opinion, she would not do that.

Bales testified that he believed Dana to be dangerous pursuant to either the third or fourth dangerousness standard—i.e., under WIS. STAT. § 51.20(1)(a)2.c. or d. He explained that Dana would decompensate absent a commitment because he did not believe that she would pursue voluntary treatment. Bales opined that this decompensation would lead Dana to revert to her precommitment behavior, becoming a danger to herself or others due to her inability to care for herself, and that she would become "so gravely disabled and so psychotic" that she would engage in behavior such as placing paper in electrical outlets and endangering others.

¶8 Doctor Bales also testified that the fifth dangerousness standard, under WIS. STAT. § 51.20(1)(a)2.e. would apply, due to his belief that Dana would not continue voluntary treatment absent a commitment and would therefore decompensate. Bales attested that Dana is not suicidal, that he had never seen her be "assaultive or threatening," and that she had been "extremely stable" during the year he had been seeing her, while she was under her current treatment regimen. Bales concluded by stating, "I think off commitment she will stop her medication and she will become psychotic again, and she will self-neglect … and then it will be, so to speak, a downhill course from there, mentally."

4

¶9 Katie Chaganos, the clinical therapist in the Community Support Program for Outagamie County, testified that she had been managing Dana's case for the previous year, and that she had been working with Dana since Dana's commitment in 2017. Chaganos confirmed that Dana lacked insight into her condition, and that during their weekly visits Dana consistently

> brings up her medication and the idea that she does not need the medication, they are detrimental to her health, she does not have any benefit from the medication, and so this is almost a circular conversation that we have every single time that we meet with one another, and it really just highlights her lack of insight into her mental illness and the need for medication.

Chaganos further confirmed that Dana consistently questioned her diagnosis, and that there had been "no progress" in getting her to understand her condition.

¶10 Chaganos also testified that at her last face-to-face meeting with Dana—which was in March 2020, before they switched to Telehealth visits due to COVID-19—she noticed that Dana had been twitching. Chaganos asked if Dana was taking her side-effect medication, which would prevent side effects from Dana's psychotropic injection. Dana said she had not done so for the previous three weeks, but Chaganos confirmed with the pharmacy that Dana had not refilled her prescription since December 2019. As a result, Chaganos concluded Dana had not been taking the side-effect medication for at least that three-month period, reflecting to Chaganos the unlikelihood that Dana would take medication voluntarily when not committed. Chaganos recommended that Dana be committed to avoid her decompensating in similar ways to her past behavior. Chaganos did note, however, that there had been no instances of dangerousness since Dana was committed and placed on treatment in 2017.

¶11 Psychologist Kelly Duggan, retained by Dana to perform an independent evaluation, testified that although she agreed Dana had a mental illness, she did not believe Dana to be dangerous. Duggan explained in her report that she did not believe Dana to be dangerous because she had not decompensated since 2017, is independent in her daily activities, and regularly attends medical appointments. In addition, Duggan placed weight on the recommendation of the 2018 report of Dr. Robert Schedgick—Dana's previous treating physician—that Dana's commitment "should be terminated if she shows that she will maintain her treatment with minimal supervision." Duggan expressed that she believed Dana should be "provided the opportunity to demonstrate her ability to maintain her mental health needs without the restrictive nature of [a WIS. STAT.] Chapter 51.42 commitment." Duggan further testified, "I think [Dana] still demonstrates some lack of insight into her mental health condition," and she noted that "I believe we talked about aspects of hallucinations related to the diagnosis, and [Dana] didn't disagree, but she didn't agree, either."

¶12 Dana also testified at the hearing. When asked, "Do you agree with the diagnosis of schizophrenia that has been given to you?" Dana replied,

> Well, I'm working with it. I guess because I had seen competent, very competent psychiatrists and medical doctors, and they never said I had schizophrenia, so I'm adjusting to that. I'm still seeing Doctor Schuman for nine years before this and he never said he saw any signs of schizophrenia.

Dana continued by confirming that she would continue with her current treatment absent a commitment. When asked again whether she agreed with her diagnosis, Dana responded, "Do I agree with it? They are the first doctors in 30 years ... I would see different doctors, and no one said I had schizophrenia. So I'm not

delusional, I don't hallucinate, I don't see things. I take care of myself, I've always taken care of myself."

¶13 The circuit court concluded that the professionals all agreed that Dana had a major mental illness, schizophrenia, that was treatable by medication. The court noted, however, that although Dana stated she was working with her diagnosis, "it doesn't seem to this [c]ourt that, at least based on her testimony, that she's bought into the diagnosis, and referred to the fact that she's had other medical diagnosis in the past that never involved a diagnosis of schizophrenia or any type of mental illness." The court found that there was not a reasonable probability that Dana would avail herself of treatment absent recommitment, given that she continued to challenge her need for medication, questioned her dosage, and even questioned her diagnosis during the hearing. Although the court noted Dana's testimony that she was working with her diagnosis and would continue treatment, it weighed her testimony against her history and the testimony of her treating physician and caseworker, both of whom had continual contact with her and opined that she does not agree with her diagnosis or medications. The court stated those professionals were "in the best position to really know what likely will happen in the future."

¶14 The circuit court concluded that the County had met its burden of proving dangerousness, based on Dana likely not availing herself of treatment absent a commitment. Given her schizophrenia, the court concluded that Dana would likely deteriorate and return to prior dangerous behaviors, including failing to properly feed herself and engaging in potentially dangerous activities. The court characterized these dangers as meeting the criteria under WIS. STAT. § 51.20(1)(a)2.c. and d., and it concluded that, absent treatment, Dana would

become a danger to herself based on her prior behaviors, and she would not be able to care for herself.

¶15    The circuit court ordered that Dana be recommitted on an outpatient basis for one additional year.  Finally, the court found that Dana could not understand the advantages and disadvantages of her medication, and it issued an order for involuntary medication and treatment.  Dana now appeals from both orders.[3]

## DISCUSSION

¶16    In a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous.  *See* WIS. STAT. § 51.20(1)(a), (13)(e).  Whether this burden has been met presents a mixed question of fact and law. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.  We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.*  Importantly, whether these findings satisfy the statutory standards is a question of law that we review de novo. *Id.*

¶17    Dana first challenges the sufficiency of the County's evidence supporting dangerousness under WIS. STAT. § 51.20(1)(a)2.  A petitioner may prove that a person is dangerous and warrants commitment under any of the five standards set forth in § 51.20(1)(a)2.a.-e., or, in the case of a recommitment, under

---

[3] Although Dana's yearlong commitment would have expired at the time of issuing this opinion under traditional circumstances, it has been extended for the purposes of preparing for an additional extension hearing.  We acknowledge Dana's counsel's diligent efforts in working to have this case heard expeditiously, even if conflicts in this court's schedule have delayed our decision in this appeal until this time.

those five standards in combination with § 51.20(1)(am).[4]  ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509.  Dana argues that the County failed to prove there was a "substantial likelihood" that she would become dangerous under § 51.20(1)(a)2.c., alleging that it failed to show both that she would not adhere to voluntary treatment of her mental illness absent a commitment order, and that there is no evidence she would be dangerous.[5]  We disagree.

¶18  To establish that a person is dangerous under WIS. STAT. § 51.20(1)(a)2.c. in a recommitment proceeding, the County must prove that person "[e]vidences such impaired judgment ... that there is a substantial probability of physical impairment or injury to himself or herself or other individuals."  *See* ***Winnebago Cnty. v S.H.***, 2020 WI App 46, ¶16, 393 Wis. 2d 511, 947 N.W.2d 761.  The requirement that the County prove dangerousness with evidence of recent acts or omissions is obviated by § 51.20(1)(am) in the

---

[4] WISCONSIN STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness.  Under this provision, if the individual who is the subject of extension proceedings is under a commitment "immediately prior" to the extension proceedings, then the petitioner may, as an alternative to the options outlined in § 51.20(1)(a)2.a.-e., prove dangerousness by showing "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."  Sec. 51.20(1)(am); ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509.  In essence, § 51.20(1)(am) removes the requirement that the petitioner show recent acts or omissions in order to establish dangerousness in a recommitment proceeding.  *See* ***J.W.K.***, 386 Wis. 2d 672, ¶19.  However, the element of dangerousness must still be proven to support any extension.  ***Id.***, ¶24.

[5] The County alleges that Dana cites to several documents in her brief that were not a part of the record at the recommitment hearing.  We consider only those documents that were a part of the record at the final recommitment hearing in our analysis of whether the County met its burden in that proceeding.  Dana points out in her reply brief, however, and we agree, that it is not inappropriate for her to cite to other documents in the appellate record for the purposes of context or to provide a general background for this court.

recommitment context.  *S.H.*, 393 Wis. 2d 511, ¶16 n.7.  Dana argues that the County failed to prove that she would not comply with her treatment plan, pointing instead to her sworn testimony at the hearing that she was "working with" her diagnosis, her knowledge and ability to request specific medications, her compliance with her treatment, and the fact that she suffered "no periods of decompensation" since being committed.

¶19    Contrary to these arguments, sufficient evidence was presented to establish that, as a result of her impaired judgment, Dana was unlikely to comply with her treatment plan absent commitment—leading to dangerous decompensation.   Although Dana argues that she was "working with" her diagnosis, both Chaganos and Dr. Bales confirmed that Dana constantly questioned not only her medications, but also whether she was schizophrenic. Even Duggan, despite concluding that Dana should be given a chance to go without commitment, stated that "I think [Dana] still demonstrates some lack of insight into her mental health condition."  The circuit court acknowledged Dana's statements, but, given the evidence, it made a credibility determination that there was not a reasonable probability that Dana would avail herself of treatment absent recommitment.  The court reached this determination based on Dana's constant challenges to her medication and diagnosis, and her statements at the hearing suggesting that she did not believe she had schizophrenia.  As an appellate court, we accept a circuit court's credibility determination unless it is clearly erroneous. *See Welytok v. Ziolkowski*, 2008 WI App 67, ¶28, 312 Wis. 2d 435, 752 N.W.2d 359.

¶20    Although Dana was mostly compliant with her treatment while under commitment and may have been able to request specific medications, those facts do not make the circuit court's credibility determination regarding her lack of

insight into her illness and need for medication clearly erroneous. Nor do those facts outweigh the professional opinions of Dr. Bales or Chaganos. Their frequent interactions with Dana led them to independent conclusions that Dana lacked insight into her illness and would not comply with a necessary treatment plan absent a commitment, and that without such treatment she would be dangerous.

¶21 Dana also argues that the County "baselessly" accused her of embellishing the side effects she was experiencing from her medication, and that she was being faulted for offering a dissenting opinion to that of her doctor. To be sure, a committee is not to be faulted simply for disagreeing with the opinions of others regarding his or her mental illness and its relation to the committee's dangerousness. However, there is no evidence to suggest that Dr. Bales' medical opinion that Dana was embellishing her side effects was "baseless," and that observation—based on Bales' regular contact with Dana as her physician—contributed to his professional opinion that Dana was dangerous. In addition, it is evident that Dana's constant questioning of her diagnosis and need for any medication, directed at both Bales and Chaganos, went beyond simply offering a reasonable dissenting opinion. Ultimately, it was for the circuit court to assess whose views of Dana's mental illness and dangerousness were accurate.

¶22 Dana next argues that there is no support for the claim that she would actually exhibit dangerous behavior under WIS. STAT. § 51.20(1)(a)2.c. but for the commitment order. She claims that she has not engaged in dangerous conduct since 2017, has not manifested any symptoms while Dr. Bales has been seeing her, and has been on the lowest possible dose of her medication. Although Dana may not have engaged in dangerous conduct or manifested any symptoms since she was committed in 2017, the standards in a recommitment hearing do not center on recent dangerous behavior. Instead, they require a "substantial

likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am). Contrary to Dana's argument, her behavior prior to her commitment—including her failure to care for or properly feed herself, the delusions she experienced, and the potentially dangerous behaviors they led to, such as placing paper into electrical sockets—can be a basis for a finding of current dangerousness under the recommitment standard. "Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions." *S.H.*, 393 Wis. 2d 511, ¶13.

¶23 Doctor Bales testified that Dana's lack of insight into her illness and medication regimen would lead to her becoming a proper subject for commitment if treatment were withdrawn. He also opined that she would "stop her medication and she will become psychotic again, and she will self-neglect and she will not be able to maintain her apartment," and that she would "become so gravely disabled and so psychotic that [she] would do things like the electrical outlet and putting things in that and endangering others." Bales based these conclusions on his review of the records, in addition to his personal observations of Dana's lack of insight into her need for medication and treatment to manage her serious mental illness. The circuit court based its dangerousness findings on these conclusions, finding that due to Dana's lack of insight into her illness and medications, she would not avail herself of voluntary treatment, and she would therefore deteriorate and revert to dangerous behavior. Given all of these factors, we conclude that the professional opinions of Bales and Chaganos, in addition to the court's credibility determinations, sufficiently support a dangerousness finding under WIS. STAT. § 51.20(1)(a)2.c.

¶24    Dana also argues that the County presented insufficient evidence of dangerousness under WIS. STAT. § 51.20(1)(a)2.d., which provides that a person is dangerous if he or she

> is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

Dana contends that there is no evidence she was malnourished or unable to meet her basic needs, such that this level of serious risk existed. Furthermore, she claims that the fact that she was "disheveled" or "unkempt" does not meet the statutory criteria for dangerousness.

¶25    While Dana is correct that one's merely being disheveled or unkempt alone does not meet the statutory criteria for dangerousness, we conclude there was sufficient evidence to support dangerousness under WIS. STAT. § 51.20(1)(a)2.d. Doctor Bales directly attested that without medication and continued treatment, Dana would self-neglect and not be able to maintain her apartment, and that she would only decompensate further from that point. Bales described the severity of Dana's mental illness leading up to her commitment in 2017, noting that she had "deteriorated" and was delusional, was not bathing properly, had little food in her apartment, and was endangering residents by placing paper in electrical outlets. Bales also attested that Dana had been homeless on and off for years, and that he was attempting to prevent that again by requesting case management. Despite Dana's argument to the contrary, all of these facts support Bales' conclusion that Dana had been unable to satisfy her

basic needs and would likely face serious physical consequences absent continued medication.

¶26 Dana describing herself as merely "disheveled" or questioning whether she was actually malnourished does not alter the evidence of the severe issues that she faced as a result of her schizophrenia prior to her commitment, or the risks that her environment posed for her. Chaganos also voiced concerns that these issues would reoccur absent treatment, given Dana's history of homelessness, her failure to take care of herself, as well as her paranoia and delusions. The circuit court relied on these descriptions—specifically, the forecasted risk of rapid decompensation—in its finding that Dana would be dangerous and unable to care for herself absent commitment. We agree with the court's rationale and analysis. We therefore conclude sufficient evidence supported the finding that Dana was dangerous under WIS. STAT. § 51.20(1)(a)2.d.[6]

¶27 We are cognizant that, by design, in certain recommitment cases acts or symptoms from far in the past can justify an extension of a commitment even when no issues or symptoms have presented themselves recently. In our analysis in these cases, we seriously consider the liberty interests of an individual who has been subject to multiple consecutive commitments, and we ensure that appropriately rigorous evidence has been presented to justify an additional extension based upon past acts, particularly those that are especially remote.

---

[6] Dana also makes an argument related to WIS. STAT. § 51.20(1)(a)2.e. Because the circuit court did not base its recommitment on that subdivision paragraph, and because we conclude Dana was dangerous under other subdivision paragraphs of § 51.20(1)(a)2., we decline to address her arguments on this issue.

¶28 In this case, there was significant evidence presented by Dana's doctor and clinical therapist that Dana does not accept her schizophrenia diagnosis, is unlikely to continue her medication voluntarily, and will very likely decompensate if taken off commitment, returning to dangerous behaviors that placed both Dana and others at risk. This evidence was based on the personal observations of Dr. Bales and Chaganos and their history with Dana, as well as their professional expertise. Equally importantly, the circuit court considered these sources of information and made a credibility determination in weighing Bales' and Chaganos' testimony against Dana's testimony and Duggan's statements in her independent evaluation. Ultimately, the court agreed with Bales and Chaganos that Dana would be unlikely to accept her diagnosis or continue medication absent a commitment. Given the testimony at the recommitment hearing and the court's credibility determinations, even when taking into account Dana's important liberty interest, we conclude there is sufficient evidence supporting the dangerousness finding and the lawful extension of Dana's commitment.

¶29 Finally, Dana challenges the order for involuntary medication and treatment. She argues that she was competent to refuse medication because she regularly engaged in conversations with her doctor about her medications and was trusted to self-dispense her side-effects medication.

¶30 For many of the reasons discussed above related to Dana's impaired judgment and her inability to understand her mental illness or her need for medication, we conclude the order for involuntary medication and treatment was appropriate. The testimony of Dr. Bales and Chaganos made it evident that Dana did not believe she had schizophrenia, she constantly asked to change or be taken off of her medication, and she embellished the medication's side effects, despite

her serious condition. In this context, we agree with Bales' analysis—relied upon by the circuit court—that Dana was incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.[7]

¶31     In addition, Chaganos testified that in early 2020, Dana was presenting with side effects from her medication, and Chaganos learned that Dana had not refilled her prescription for her medication to manage those side effects for several months, bringing into question Dana's understanding and voluntary use of necessary treatment available to her. Dana also argues that her medication only improves her quality of life and that there is no proof she would be dangerous without it. Our earlier analysis concludes otherwise: the County met its burden in proving that Dana will likely decompensate and become a danger to herself and others absent treatment. Accordingly, we affirm both the order for recommitment and the accompanying order for involuntary medication and treatment.

---

[7] In order to establish that a person is not competent to refuse medication or treatment under WIS. STAT. § 51.61(1)(g)4., one of two standards must be met: (1) the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives; or (2) the individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

The circuit court recited the first of these two standards while making its findings at the recommitment hearing, but it checked the box designating the second standard on the written involuntary medication order. However, any such discrepancy in this regard is harmless, as both of the statutory standards are supported by Dr. Bales' testimony and the court's findings that due to her impaired judgment, Dana could not comprehend her mental illness or understand the advantages and disadvantages of her medication options.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.