ANN WALSH BRADLEY, J. (dissenting).
¶ 138 At its core, academic freedom is a professional principle, not merely a legal construct.[1] It embraces the academic freedom of the faculty as well as the academic freedom of the institution. "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also ... on autonomous decisionmaking by the academy itself." Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 226 n.12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (internal citations omitted).
¶ 139 Within academic freedom lies the concept of shared governance. It includes the right of faculty to participate in the governance of the institution on academic-related matters. Shared governance in colleges and universities has been forged over decades to address the specific issues that arise in the workplace of higher education.
¶ 140 The majority errs in conducting only half of the academic freedom analysis. It fails to recognize, much less analyze, the academic freedom of Marquette as a private, Catholic, Jesuit university. As a result, it dilutes a private educational institution's autonomy to make its own academic decisions in fulfillment of its unique mission.
¶ 141 Further, the majority compounds this error by rendering meaningless a key component of shared governance, reducing the faculty's bargained-for role in reviewing dismissal for cause to "nothing" or a mere "distraction." In disregarding the faculty hearing committee's expertise and unanimous recommendation, it throws aside a process that is mutually agreed upon and time-honored. Apparently, the majority thinks it is in a better position to address concerns of academic freedom than a group of tenured faculty members who live the doctrine every day.
¶ 142 Additionally, the majority conducts its analysis with a selective view of the facts. Missing from its opinion are key facts that informed McAdams' action. After publishing the blog post, McAdams actively promoted it to local and national media outlets. The record reflects that McAdams did so by "distributing copies of the audio recording to interested journalists and bloggers, posting follow-up stories linking back to the Nov. 9 post, creating a category of posts linked to Abbate by name, and arranging to appear on radio and television interviews about the story and subsequent controversy." McAdams wrote that he was aware that " '[w]hen one *756 does something that gets national publicity, some jerks are going to say nasty things.' "
¶ 143 That prophecy was fulfilled here. Within hours of the blog post, Abbate started receiving negative emails, which only multiplied in the following weeks. She feared for her safety at Marquette and within weeks withdrew her dissertation proposal and transferred to another university despite adverse consequences to her academic progress.
¶ 144 The travesty of the majority opinion lies not just in its decision for Marquette University. Because Marquette has adopted a definition of academic freedom and uniform procedures that have been embraced by many other colleges and universities, the decision is far reaching. The majority's decision to so readily discard institutional academic freedom and to disrespect part of the time-honored and bargained-for shared governance procedures will reverberate throughout this state.
¶ 145 Finally, because I determine that the doctrine of academic freedom does not protect McAdams from discipline, I address his argument that the First Amendment does. McAdams is wrong. His contract does not give him the full-throated First Amendment rights that would be given a private citizen vis-à-vis the government.
¶ 146 Accordingly, I respectfully dissent.
I
¶ 147 The majority errs first by curbing its discussion of academic freedom. It takes an expansive view of McAdams' academic freedom, but does not pay any mind to the academic freedom of the university.
¶ 148 "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also ... on autonomous decisionmaking by the academy itself[.]" Ewing, 474 U.S. at 226 n.12, 106 S.Ct. 507 (internal citations omitted). The term "academic freedom" is used to denote both the freedom of the academic institution to pursue its ends without interference from the government, as well as the freedom of the individual teacher to pursue desired ends without interference from the institution.[2]
*757 Piarowski v. Illinois Cmty. Coll. Dist. 515, 759 F.2d 625, 629 (7th Cir. 1985) (citations omitted); see also Feldman v. Ho, 171 F.3d 494, 495 (7th Cir. 1999) ; J. Peter Byrne, Academic Freedom: A "Special Concern of the First Amendment", 99 Yale L.J. 251 (1989).
¶ 149 To manifest this freedom to pursue their ends, educational institutions set their own missions. As a Catholic, Jesuit institution, Marquette University operates according to certain guiding values. These values include the "holistic development of students" and a "commitment to the Jesuit tradition and Catholic social teaching."[3] It is also a guiding value of the institution to foster "vigorous yet respectful debate."
¶ 150 Marquette's status as a Jesuit institution is a cornerstone of its identity. According to amicus Association of Jesuit Colleges and Universities: "Being 'Catholic, Jesuit universities' is not simply one characteristic among others but is [their] defining character, what makes [them] to be uniquely what [they] are. ... As Jesuit colleges and universities, [they] are a continuation of the Ignatian heritage and of the distinctive tradition of Jesuit education."
¶ 151 Jesuit institutions operate under the "Ignatian pedagogy." This educational philosophy encourages faculty to consider the "context" of the individual students in the classroom and "uniquely characterizes the relationship the faculty member has with the student [with whom] he [or] she attempts to create a teaching/learning environment."[4]
¶ 152 Private institutional learning environments present unique concerns and a particular need for independence in decision making. If the founding principles of each individual university are to be given life, the institution must possess the freedom to determine the consistency or inconsistency of actions with those principles.
¶ 153 Institutional academic freedom is inclusive of four "essential freedoms": "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Sweezy v. State of N.H. by Wyman, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring). Although no court has clearly defined the scope of institutional academic freedom, McAdams' conduct and the faculty hearing committee procedures at issue in this case appear to implicate the first of these "essential freedoms": who may teach. Although also relevant to public universities, this concern is especially germane in the context of private universities.
¶ 154 In determining who may teach at its university, Marquette has academic freedom to uphold its values and principles. It has academic freedom to provide an educational environment that is consistent with its mission as a university.
¶ 155 McAdams' appeal focuses on his individual rights, and the majority follows suit. However, McAdams' rights to academic *758 freedom are not the only rights at issue.[5] An educational institution, here a private, Catholic, Jesuit institution, possesses the academic freedom to operate in accordance with its principles as long as it does not violate governing laws.[6] Such a right should be given some consideration, rather than the silent treatment the majority offers.
II
¶ 156 Within the concept of academic freedom lies the right of faculty to participate in the governance of the institution in academic-related matters. The majority errs next in jettisoning the shared governance of colleges and universities that has been forged over decades to address the specific issues that arise in this unique workplace. In the majority's view, the work of the faculty hearing committee (FHC) is of no import. It instead serves as a mere "distraction": "all of the time, energy, and resources that went into the Discipline Procedure and the richly-detailed Report are distractions from the necessary focus of our analysis." Majority op., ¶ 46.
¶ 157 Further, the majority doubles down on this assertion, overtly stating that the FHC's work represents nothing of substance: "As far as the Faculty Statutes and Faculty Handbook are concerned, the president may proceed as if the Report said nothing but that the FHC had completed the Discipline Procedure." Id., ¶49. It deems the work of the FHC not relevant and even raises the specter that perhaps the university need not have convened the FHC at all. See id., ¶47 n.16. Each of these conclusions ignores the context in which this dispute arises. Such analysis renders the concept of shared governance merely illusory and completely removes faculty input from these important decisions.
¶ 158 As observed above, the university has a strong interest in its own academic freedom to make autonomous decisions. It exercises that academic freedom through the manifestation of the framework of shared governance.[7]
¶ 159 "Shared governance" allows university faculty to play a role in decisions that affect the academic mission of the university. The American Association of University Professors (AAUP) has extensively considered and set forth principles of shared governance in guidance documents. In 1940, it issued a Statement of Principles on Academic Freedom and Tenure, and in the decades that followed, it further refined the foundational principles therein.[8] The principles adduced by the *759 AAUP are well recognized and have been widely adopted throughout higher education.[9]
¶ 160 Faculty participation in decisions regarding curriculum, tenure, and other academic-related matters is essential to the operation of the university. As the Marquette Academic Senate put it in its amicus brief to this court, "[s]hared governance includes, as a necessary component, prior faculty review of any attempt by the University administration to override the protections of tenure and dismiss or suspend a tenured faculty member."
¶ 161 AAUP's guidance documents include recommended procedural protections for faculty members. These procedural protections require that any proposed suspension or dismissal of a tenured faculty member come before an independent faculty committee for review prior to any adverse employment action. Marquette adopted a statutory procedure consistent with the AAUP's recommended methodology, which sets forth procedures for contested suspensions or terminations.[10]
¶ 162 The independent committee called for in the AAUP's guidance documents manifest in Marquette's case as the FHC. It is made up of tenured faculty members elected to serve three-year terms. In accordance with the adopted procedure, the FHC serves as an advisory body tasked with scheduling a hearing, determining the existence of cause, and making findings of fact and conclusions.
¶ 163 Under the majority's analysis, the FHC proceedings are rendered completely unnecessary.[11] It is the President who makes the decision as to discipline, the majority states, so there is no product of the FHC to which a court can defer. This treatment of the FHC ignores its role within the shared governance structure of the university.[12]
¶ 164 The FHC is a mutually agreed-upon dispute resolution mechanism. It is *760 composed of Marquette faculty members who signed contracts similar to McAdams' and whose employment relationships are governed by the same faculty statutes. In other words, the members of the FHC live and breathe academic freedom and are in a position to say what the intent of the parties was in signing a contract guaranteeing "academic freedom."[13]
¶ 165 Indeed here, the FHC was composed of seven tenured members of the faculty, chaired by a law professor, and was observed by a representative of the AAUP. After receiving evidence over the course of four days, the FHC unanimously found that there was clear and convincing evidence that Marquette had "discretionary cause" to impose discipline.[14] Accordingly, the FHC recommended that Marquette University President Michael Lovell impose a paid suspension of up to two semesters. Consistent with the FHC's recommendation, President Lovell imposed upon McAdams a two-semester suspension.
¶ 166 The United States Supreme Court has directed that "[w]hen judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment." Ewing, 474 U.S. at 225, 106 S.Ct. 507. It made this pronouncement with respect to a faculty decision that it characterized as "made conscientiously and with careful deliberation." Id. We can realize the Supreme Court's command by affording the respect due to the FHC's expertise and specialized knowledge.
¶ 167 With regard to the FHC's factual findings, "great respect" is surely appropriate. The FHC heard four days of evidence and produced a detailed 123-page report that was clearly "made conscientiously and with careful deliberation." See id.
¶ 168 It is the FHC, and not this court, that observed the demeanor of witnesses and is in a position to assess credibility. Deference to circuit courts' factual findings is appropriate in similar circumstances. Welytok v. Ziolkowski, 2008 WI App 67, ¶ 28, 312 Wis. 2d 435, 752 N.W.2d 359 (citation omitted) (explaining that "such deference is appropriate because the court has the opportunity to observe firsthand the demeanor of the witnesses and gauge the persuasiveness of their testimony").
¶ 169 Other jurisdictions have echoed this approach, and realize the Supreme Court's exhortation of "great respect" by affording deference to the conclusions of faculty hearing committees. For example, in *761 Yackshaw v. John Carroll University Board of Trustees, 89 Ohio App.3d 237, 624 N.E.2d 225, 225-27 (1993), the Ohio court of appeals reviewed a similar breach of contract case involving a private university's hearing committee. The Yackshaw court found "rationale and guidance from the standard of review adopted by administrative agencies, especially when the involved parties have bound themselves contractually." Id. at 228.
¶ 170 Such "great respect" makes particular sense in the context of a private, Catholic, Jesuit institution with a distinct mission like Marquette. Indeed, in Murphy v. Duquesne University of the Holy Ghost, 565 Pa. 571, 777 A.2d 418, 433 (2001), the Pennsylvania Supreme Court further explained the rationale for its determination that a faculty hearing procedure like that at issue here was an exclusive procedure. The Murphy court observed that Duquesne, like Marquette, is a private, Catholic university with a particular mission:
The University is an ecumenically-based institution dedicated to promoting through the members of its tenured faculty the ethical and religious values of the "Judaeo-Christian tradition in its Catholic dimension." It comes as no surprise that the University and its faculty agreed not to cede to any lay outsider or secular institution the right to define and determine what behavior on the part of a faculty member was so antithetical to its mission that he could not remain a member of the University's community, and instead, concurred that the process set out in the Contract would finally decide whether a faculty member's actions rose to the level of serious misconduct and whether forfeiture was in order.
Id. at 433.
¶ 171 Here, it is also the faculty that is in the best position to determine "what behavior on the part of a faculty member [is] so antithetical to its mission that he could not remain a member of the University's community." See id. The faculty unanimously determined that McAdams exhibited such behavior that violates the norms of the academic profession so as to call into question his fitness as a member of the university community. As President Lovell observed in his letter to McAdams, a unanimous decision in the context of academia is no small feat: "Getting a diverse group of faculty to unanimously agree on any topic can be difficult, so to have seven of your peers uniformly condemn and characterize your actions as egregious sends a strong message to my office and to the broader Marquette community."
¶ 172 By refusing to afford "great respect" to President Lovell's reliance on the unanimous faculty determination, the court as the third branch of government inserts itself into the fray. Such an exercise is antithetical to the freedom of the academic institution to pursue its ends without interference from the government.
¶ 173 Rather than properly according the respect due to President Lovell's reliance on the FHC's findings and conclusions, the majority opinion renders meaningless a key part of shared governance, reducing the faculty's role in this decisionmaking to nothing. It disregards the FHC's expertise, throwing aside a process that is mutually agreed-upon and time-honored.
III
¶ 174 The majority errs third by disregarding significant facts in its analysis. It concludes that McAdams' blog post cannot be the basis for discipline because the posting was a legitimate exercise of McAdams' academic freedom. Majority op., ¶ 84. In the majority's view, "the blog post has nothing relevant to say about Dr. McAdams'
*762 fitness as a professor." Id., ¶73. It further determines that "[j]ust because vile commentary followed the blog post does not mean the blog post instigated or invited the vileness." Id., ¶76. The majority misframes the issue.
¶ 175 In his letter to McAdams informing him of the disciplinary action taken, President Lovell is clear that it was not the views expressed in the blog post that led to discipline: "I think it is important to state that the sanctions being brought against you are solely based on your ACTIONS as a tenured faculty member at Marquette University, and have nothing to do with the political or ideological views expressed in your blog" (capitalization in original). President Lovell's letter thus makes clear that McAdams was disciplined for his actions, and not the blog post's viewpoint. Thus, the question is not "whether [the blog post's] contents remove the doctrine's protections." Id., ¶64. It is whether McAdams' actions are worthy of protection.
¶ 176 The majority recognizes that in engaging in extramural activities, a professor "occupies a 'special position in the civil community,' one that comes with 'special obligations.' " Majority op., ¶ 65. Included in these "special obligations" is the duty to "exercise appropriate restraint." Id.
¶ 177 McAdams did not exercise any restraint at all, let alone appropriate restraint. I agree with the FHC that "where substantial harm is foreseeable, easily avoidable, and not justifiable, it violates a professor's obligations to fellow members of the Marquette community to proceed anyway, heedless of the consequences."
¶ 178 McAdams' actions were well summarized in President Lovell's discipline letter, where he approvingly quoted from the FHC report: "[McAdams'] use of a surreptitious recording, along with Ms. Abbate's name and contact information, to hold Ms. Abbate up for public contempt on his blog, recklessly exposed her to the foreseeable harm that she suffered due to Dr. McAdams's actions."
¶ 179 The majority unpersuasively asserts that the vile commentary immediately following the blog post "does not mean the blog post instigated or invited the vileness." Majority op., ¶ 76. The only way the majority can reach this conclusion is by ignoring significant facts in the record.[15]
¶ 180 First, McAdams knew the effect his blog post would have on Abbate. Among the FHC's factual findings that go unmentioned by the majority is that Dr. McAdams wrote in a blog post that "[w]hen one does something that gets national publicity, some jerks are going to say nasty things," indicating he was well aware of this modern media phenomenon. Indeed, that is exactly what happened here.
¶ 181 Shortly after the post's publication, Abbate began to receive hateful emails. The negative communications multiplied over the next several days, particularly after the incident received coverage on Fox News. She was forced to shut down her email account and remove her email address from Marquette's graduate student website.
*763 ¶ 182 Several of the communications Abbate received expressed violent and profane thoughts. She feared for her physical safety and experienced significant detrimental effects on her mental and physical health. A public safety officer was even posted outside Abbate's classes for two weeks.
¶ 183 Abbate ultimately withdrew from her dissertation proposal defense and transferred to another university. This transfer requires that she repeat three semesters of course work.
¶ 184 The majority further fails to mention that "Dr. McAdams purposefully omitted the name of a supporter of his blog from a comment he posted because 'the person was afraid of blowback or harassment.' " Why would McAdams do this if he was blissfully unaware of the consequences of publishing a student's name, as the majority asserts?
¶ 185 Additionally, the FHC report demonstrates that McAdams has "on at least three occasions used the prospect of a mention on his blog as a threat." It indicates that McAdams threatened a Marquette student, the vice president for student affairs, a university provost, and a Dean that he would "raise hell" on his blog if they acted in a manner inconsistent with McAdams' wishes. McAdams pointedly told a Dean to "be careful" because "you don't want to be on my blog." Why would McAdams make such threats if he did not know what would happen to those whose names were published?
¶ 186 Also conveniently omitted from the majority opinion are any facts related to McAdams' active promotion of the blog post to local and national media outlets. After he made the blog post, McAdams actively promoted the story by distributing copies of the audio recording to interested journalists and bloggers, posting follow-up stories linking back to the post, creating a category of posts linked to Abbate by name, and arranging to appear on radio and television interviews about the story and subsequent controversy. He provided copies of the surreptitious recording to representatives of Fox News, Inside Higher Ed, and a local Fox television affiliate.
¶ 187 These omitted facts indicate that McAdams indeed did "instigate" or "invite" the vileness that followed his blog post. He knew what would happen, and he actively ensured that it would happen.
¶ 188 McAdams' actions certainly have something "relevant to say about Dr. McAdams' fitness as a professor." See majority op., ¶ 72. McAdams knew what he was doing, and, unfortunately for Abbate, the blog post had its intended effect. The revealing of a student's contact information for the purpose of holding that student up for public ridicule and harassment is not a protected act of academic freedom.[16]
IV
¶ 189 Because I determine that academic freedom does not save McAdams from the consequences of his actions, I also must address his argument that the First Amendment provides such salvation. I begin my examination of McAdams' argument by defining the parameters of the First Amendment protections to which McAdams is entitled.
¶ 190 "The [F]irst [A]mendment to the United States Constitution limits the actions *764 of the federal and state governments. It provides no protection against action by private persons." Harman v. La Crosse Tribune, 117 Wis. 2d 448, 452, 344 N.W.2d 536 (Ct. App. 1984) (citation omitted); see also Hudgens v. NLRB, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state.") (citation omitted).
¶ 191 Thus, as a private institution, Marquette's actions are not limited by the First Amendment. The First Amendment does not, without more, protect McAdams from discipline in his capacity as a professor at a private university.[17]
¶ 192 However, Marquette Faculty Statute § 307.07(2) provides that "[d]ismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights guaranteed them by the United States Constitution." McAdams contends that this language grants him a contractual right to free speech that "is coextensive with his right to freedom of expression under the First Amendment as a private citizen."[18]
¶ 193 Of note in this discussion is the difference between the Marquette Faculty Statute and the AAUP's recommended institutional regulation on this subject. McAdams relies on language that is nonexistent, having been specifically removed from the Marquette Faculty Statute.
¶ 194 The AAUP recommends for inclusion in faculty contracts language stating that: "Dismissal will not be used to restrain faculty members in the exercise of academic freedom or other rights of American citizens."[19] Marquette's choice not to adopt the recommended "American citizens" language likely explains why McAdams' arguments before the FHC asserted rights not as a citizen but rather rights tantamount to those of an employee of a government employer.
¶ 195 He now changes course before this court, appearing to realize that the First Amendment rights of an employee of a government employer have been recognized as less than those afforded an American citizen. See, e.g., Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Marquette's choice not to adopt the language also supports the argument that it did not intend that Faculty Statute § 307.07 afford to McAdams the contractual right to the full-throated First Amendment protections of a citizen.
*765 ¶ 196 Further, I agree with the FHC, the circuit court, and Marquette that McAdams' proffered interpretation leads to absurd results. See Star Direct, Inc. v. Dal Pra, 2009 WI 76, ¶ 62, 319 Wis. 2d 274, 767 N.W.2d 898 (explaining that contracts are construed to avoid absurd results). If it is indeed the case that the protections granted by Marquette Faculty Statute § 307.07 are "coextensive" with the rights afforded to private citizens under the First Amendment, McAdams would be free to teach virtually anything or nothing at all in his classes. Marquette would be unable to discipline McAdams unless his speech fell into one of the few, narrow categories of speech that is not afforded First Amendment protections.[20]
¶ 197 McAdams asserts that this conclusion does not follow because conduct within the classroom is governed by the provisions on absolute cause set forth in his contract, and conduct amounting to absolute cause is not protected by the First Amendment. But that is not what Faculty Statute § 307.07 says. By its plain language, Faculty Statute § 307.07, applies equally to dismissals based on absolute or discretionary cause.[21]
¶ 198 In fact, McAdams' interpretation of Faculty Statute § 307.07 would render Marquette's standards for absolute and discretionary cause meaningless. See Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶ 45, 326 Wis. 2d 300, 786 N.W.2d 15 ("When possible, contract language should be construed to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.' "). Under McAdams' misreading, so long as some form of protected speech was involved, he could not be punished despite failing the tests for absolute or discretionary cause.
¶ 199 Accordingly, I conclude that neither academic freedom nor the First Amendment saves McAdams from the consequences of his reckless actions.
¶ 200 For the foregoing reasons, I respectfully dissent.
¶ 201 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

American Association of University Professors, Statement on Civility, https://www.aaup.org/issues/civility (last visited June 18, 2018).

Some universities recognize the incompatibility of insulating students from micro-aggressions, via trigger warnings and safe spaces, with academic freedom: "Our commitment to academic freedom means that we do not support so-called 'trigger warnings,' we do not cancel invited speakers because their topics might prove controversial, and we do not condone the creation of intellectual 'safe spaces' where individuals can retreat from ideas and perspectives at odds with their own." John Ellison, Dean of Students at the University of Chicago, Letter to Class of 2020, https://news.uchicago.edu/sites/default/files/attachments/Dear_Class_of_2020_Students.pdf (last visited June 18, 2018).

John Stuart Mill, On Liberty, in Utilitarianism and On Liberty 88, 100 (Mary Warnock ed., 2d ed. 2003) (1859).

Thomas Jefferson, University of Virginia, Comprehensive Standards 3.7.4: Academic Freedom, http://www.virginia.edu/sacs/standards/3-7-4.html (last visited June 18, 2018).

Marquette University, Mission Statement, http://www.marquette.edu/leadership/values.php (last visited June 18, 2018).

Yale University, 1974 Report of the Committee on Freedom of Expression at Yale, https://yalecollege.yale.edu/deans-office/reports/report-committee-freedom-expression-yale (last visited June 18, 2018).

See Bradley Campbell & Jason Manning, The End of Academe: Free Speech and the Silencing of Dissent, Chron. of Higher Educ. (Jan. 21, 2018), https://www.chronicle.com/article/The-End-of-Academe-Free/242290.

See Daniel B. Klein & Charlotta Stern, Groupthink in Academia, Am. Enterprise Inst. (Nov. 14, 2007), https://www.aei.org/wp-content/uploads/2011/10/20071113_GroupthinkinAcademia.pdf.

Academic Freedom, Black's Law Dictionary (10th ed. 2014).

American Association of University Professors, 1940 Statement of Principles on Academic Freedom and Tenure, https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure (last visited June 18, 2018). The AAUP, founded in 1915, is a non-profit organization representing the interests of over 40,000 faculty, librarians, graduate students, and academic professionals at institutions of higher learning across the country. AAUP appears as amicus in this case in support of McAdams and declares it "is committed to advancing academic freedom, the free exchange of ideas, and higher education's contribution to the common good." As the first organization to develop codes of academic freedom, AAUP's statements remain the model. Julie H. Margetta, Taking Academic Freedom Back to the Future: Refining the "Special Concern of the First Amendment", 7 Loy. J. Pub. Int. L. 1, 5 (2005). As the court explains, Marquette does not dispute that it adopted AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. See majority op., ¶¶ 61-62, n.20.

Russell Kirk, Academic Freedom: An Essay in Definition 1 (1955) (quotation marks omitted).

University of Virginia, Comprehensive Standards 3.7.4: Academic Freedom, http://www.virginia.edu/sacs/standards/3-7-4.html (last visited June 18, 2018).

AAUP, Statement on Civility, https://www.aaup.org/issues/civility (last visited June 18, 2018).

AAUP, Ensuring Academic Freedom in Politically Controversial Academic Personnel Decisions (Aug. 2011), https://www.aaup.org/NR/rdonlyres/895B2C30-29F6-4A88-80B9-FCC4D23CF28B/0/PoliticallyControversialDecisionsreport.pdf.

AAUP, Statement on Professional Ethics (1966), https://www.aaup.org/report/statement-professional-ethics (last visited June 18, 2018).

Similarly, the First Amendment does not protect all speech. See State v. Breitzman, 2017 WI 100, ¶¶ 51-54, 378 Wis. 2d 431, 904 N.W.2d 93 (explaining classes of speech not protected).

The court received a variety of amicus briefs from private businesses concerned about the reverberations of this case on the private sector. Their fears are unfounded. University campuses inhabit a unique environment. The doctrine of academic freedom has no application within private enterprise, unless of course a private entity incorporates the doctrine into employee contracts. Marquette University, although a private institution, chose to guarantee academic freedom to McAdams in his contract.

The text of the First Amendment provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
As a private entity, Marquette, of course, is neither Congress nor the government, and can adopt and enforce rules not implicated by the Constitution. Marquette, however, chose to incorporate into McAdams' contract rights guaranteed "by the United States Constitution."

These two cases are often discussed together in assessing whether speech of a public employee was protected, which is known as the Pickering - Connick test. But cf. Garcetti v. Ceballos, 547 U.S. 410, 425, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) ("[E]xpression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence.").

Larry D. Spurgeon, A Transcendent Value: The Quest to Safeguard Academic Freedom, 34 J.C. & U.L 111, 130 (2007).

Heather MacDonald, The Penn Law School Mob Scores A Victory, Wall St. J. (Mar. 18, 2018), https://www.wsj.com/articles/the-penn-law-school-mob-scores-a-victory-1521397094; Erika Christakis, My Halloween Email Led to a Campus Firestorm, The Wash. Post (Oct. 28, 2016), https://www.washingtonpost.com/opinions/my-halloween-email-led-to-a-campus-firestorm--and-a-troubling-lesson-about-self-censorship/2016/10/28/70e55732-9b97-11e6-a0ed-ab0774c1eaa5_story.html?utm_term=.7fae2361b7d7.

See Faculty Statute § 307.07(11) (stating the "Administration may appear or be represented by its legal counsel"). At the hearing, the University appeared by two attorneys.

See Faculty Statute § 307.07(1).

See Faculty Statutes § 307.07(18)-(19); Faculty Handbook art. 4, § 1.01.1(1).